# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | |
|---|---|
| WANDA STUDDARD GLASGOW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  CIVIL ACTION 6:12-CV-01017-KOB |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social, | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

The claimant applied for disability insurance income under Title II of the Social Security Act as well as for supplemental security income under Title XVI on June 26, 2008.  The claimant alleges disability arising from injuries related to a fall suffered on March 23, 2007, specifically described as a neck injury and degenerative disc disease.  (R. 129-36, 143).

The claimant filed a timely request for review, and an Administrative Law Judge held a hearing on July 30, 2010.  The ALJ found the claimant not disabled in an opinion dated August 24, 2010.  The Social Security Administration Appeals Council denied the claimant's request for review of the ALJ decision on February 1, 2012.  (R. 59, 8-23, 1).

The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3).  For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUE PRESENTED

The only issue presented by the claimant is whether the ALJ properly applied the Eleventh Circuit's three-part pain standard.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record that support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to: "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  To

make this determination the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> an affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

In evaluating the claimant's testimony and credibility regarding pain and other subjective complaints, the Commissioner must consider whether the claimant adequately demonstrated an underlying medical condition potentially capable of producing the symptom(s) alleged by claimant, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.

In applying the three-part standard, if the ALJ decides not to credit a claimant's subjective testimony of pain, he must discredit it explicitly and articulate his reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). Failure of the ALJ to articulate the reasons for discrediting the claimant's subjective complaints of pain requires that this court accept the testimony as true. *Id.*

When considering the credibility of the claimant's testimony as to the severity or disabling extent of her symptoms, the ALJ may properly consider testimony of her daily activities. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

The ALJ may consider the failure by the claimant to seek medical care or attention for an allegedly disabling condition, without good cause for such failure such as financial inability, when determining the extent and nature of the claimant's alleged condition. *Sheldon v. Astrue*, 268 Fed. Appx. 871, 872 (11th Cir. 2008); *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).

## V. FACTS

The claimant is forty-five years old and possesses an eleventh grade education. In her application for disability insurance and supplemental security income, the claimant alleged disability caused by neck pain and degenerative disc disease arising after a fall onto her back on March 23, 2007. The claimant has not participated in any gainful activity or work since that time. The claimant's past relevant work experience includes work as a laborer and general worker for a tile manufacturer that involved the operation of heavy equipment; owner and operator of a small grocery store and restaurant; office manager for a small business; self-employed commercial cleaner; and operations manager for a supermarket chain. (R. 64-70, 143, 150-58).

*Physical Limitations*

The claimant visited Lamar Regional Medical Center on March 28, 2007, reporting that she fell on her back. She reported to Dr. Kimberly Balasky that she was experiencing neck pain, trouble breathing, and difficulty bending her neck forward. The claimant also asserted that her

neck pain, as well as some numbness in her arm, predated her fall, but that she was accustomed to compensating for it.  Dr. Balasky described the claimant as being in no acute distress, with decreased rotation to the left and right of the cervical neck, inability to fully flex the head, and point tenderness over the cervical and upper thoracic spine, especially at C5-C6.  An x-ray indicated some narrow disc spaces, possible malalignment of the vertebra, and an "unusual piece of bone" above an area where the claimant reported tenderness.  Dr. Balasky advised the claimant to refrain from lifting more than a certain amount,[1] prescribed Flexeril and Lortab, and ordered an MRI.  (R. 191-92).

  Dr. Robert Robinson, at the request of Dr. Balasky, performed an MRI of the claimant's cervical spine at West Alabama Neurosurgery and Spine on April 12, 2007.  The MRI showed chronic disc degeneration at C5-C6 with a posterolateral disc herniation on the left, and no other notable results.  The notes from the visit also describe the claimant as having normal motor strength.  Dr. Robinson noted the claimant as having chronic neck and left arm pain, single-level disc disease, and described her as "an excellent candidate" for an anterior cervical discectomy and fusion operation.  Dr. Robinson concluded that the claimant's smoking would require one of several options in concert with surgery and recommended from among those options the use of allograft and an external bone growth stimulator postoperatively.  (R. 188-89).

  The claimant visited Dr. Robinson at West Alabama Neurosurgery and Spine at Dr. Balasky's request again on April 19, 2007.  Dr. Robinson indicated no changes to her condition in his notes.  (R. 196-97).

---

[1] The exact amount (in pounds) that Dr. Balasky advised the claimant not to exceed when lifting is omitted from the typed report.

On April 23, 2007, Dr. Robinson performed an anterior cervical discectomy and fusion on the claimant, with allograft interbody fusion and Atlantis anterior cervical plating. Dr. Robinson reported no complications during or after the procedure. (R. 184-86, 198-99).

A discharge summary from the next day described the claimant as having tolerated the procedure well, having experienced "elimination of all pain," and being discharged in good condition. (R. 195).

The claimant returned for a follow-up exam on May 15, 2007, and Dr. Robinson noted that her arm pain had been eliminated. He also reported that x-rays demonstrated what appeared to be some fragmentation of her graft and that the claimant had experienced some right side neck discomfort, but otherwise was doing well. (R. 187).

The claimant applied for Social Security benefits on June 26, 2008. In a Disability Report filed on the same date, the claimant listed her conditions as neck injury and degenerative disc disease, and her symptoms as the inability to lift objects, turn her head in certain directions, or look straight up or down. The claimant indicated on the report that her symptoms and pain rendered her unable to work as of March 23, 2007. (R. 138-47).

On July 6, 2008, the claimant completed a function report for the Social Security Administration describing her routine activities and how her symptoms allegedly affect her ability to function. She described her capabilities as somewhat limited as to normal household functions, but stated that she was able to "sometimes" clean the house, wash clothes, and interact with her children and husband. She alleged that she had difficulty picking up objects, turning her head, reaching for items above her head, and driving. She also indicated that she was no longer able to engage in activities such as playing outdoors with her children or reading for extended

periods of time. The claimant described herself as being able to lifting only five to ten pounds, stand for only an hour at a time, and bend over only carefully. She noted that she could not push or pull without straining her arms. The claimant stated that she could only walk 200 yards before needing to rest for five minutes. (R. 160-67).

On August 9, 2008, Dr. Angela Coleman treated the claimant through MDSI Physician Services at the request of the Disability Determination Service. Dr. Coleman's notes from the visit describe the claimant as generally suffering from chronic neck pain in her cervical spine, "uncontrolled pain," spasms of the neck muscles, and decreased range of motion of the neck. Dr. Coleman noted that the claimant described her average daily level of pain at "6-7/10." Dr. Coleman recorded the claimant's testimony of her daily activities, including cooking and cleaning; caring for her husband and grandchildren; light housework such as vacuuming and mopping; and driving herself. Dr. Coleman also noted the claimant's past treatment and surgery and her usage of over-the-counter pain medications Motrin and Tylenol. Notably, Dr. Coleman did not offer any restrictions on the claimant's physical capability. (R. 205-09).

At the request of the Disability Determination Service, medical consultant M. LeAnn Hill completed a Residual Functional Capacity Assessment of the claimant on August 28, 2008. The RFC listed the claimant's primary diagnosis as cervical degenerative disc disease. Under external limitations, Ms. Hill described the claimant as capable of occasionally lifting up to fifty pounds, frequently lifting up to twenty-five pounds, standing and walking for around six hours, sitting for around six hours, and pushing and pulling in a limited capacity with her upper extremities. In support of these assertions, Ms. Hill listed Dr. Robinson's operative notes dated April 23, 2007 from DCH Regional Medical Center, and Dr. Balasky's report dated March 28, 2007 from Lamar

Regional Medical Center. From these sources, the Ms. Hill noted diagnoses of vertebra malalignment; neck stiffness; decreased cervical range of motion; largely normal grip strength; normal gait; spasms of the neck; and limited ability to push and pull objects overhead. Under postural limitations, Ms. Hill assessed the claimant as capable of frequently climbing, balancing, stooping, kneeling, crouching, and crawling, and never capable of climbing ladders, ropes, or scaffolds. Under manipulative limitations, Ms. Hill stated that the claimant had only limited capability to reach all directions, including overhead. Ms. Hill established no significant visual, communicative, or environmental limitations. Ms. Hill described the claimant's allegations generally as only "partially credible," stating that the severity alleged of her symptoms generally was not fully consistent with medical evidence, but noted that the claimant's assertions regarding her inability to reach overhead and turn her head were supported by medical evidence. (R. 210-17).

On August 9, 2008 the claimant visited an emergency room complaining of back pain, and was diagnosed with a pulled muscle. Notably, the visit notes made no mention of her neck pain.[2] (R. 222).

The next day, August 10, 2008, the claimant sought treatment with Dr. George Luckey through Whatley Health Services. Dr. Luckey indicated in his notes that the claimant's back pain had improved, diagnosed her with back spasms and possibility of infection or kidney stones, and prescribed Toradol and Lortab for her back pain. Dr. Luckey also recommended that the claimant force fluid intake. Notably, the claimant made no mention of neck pain or its disabling

---

[2] The court cannot determine the name of the attending physician from the emergency room visit from the record.

effects during the visit. (R. 222)

The claimant's attorney requested information from Dr. Luckey on June 24, 2009. Dr. Robert Long responded to the request, noting that Dr. Luckey no longer worked in that office and that Dr. Long had not treated the claimant. Despite indicating clearly on the form that he "could not evaluate without examining patient," Dr. Long nonetheless indicated on another page of the form that the claimant's pain was "present to such an extent as to be distracting to adequate performance of daily activities or work." Dr. Long also indicated that claimant's physical activity such as walking, standing, or sitting would result in "some increase [of pain] but not to such an extent as to prevent adequate functioning in such tasks." Dr. Long indicated side effects of prescribed medication on the claimant's ability to work were "unknown." (R. 221-22).

The claimant did not receive any further documented medical attention until April 30, 2010. On that date, the claimant visited Whatley Health Services with a possible urinary tract infection, and the treating nurse practitioner prescribed Bactrim. The nurse also strongly recommended that she cease smoking, that she abstain from carbonated beverages, and recommended that she return if the symptoms persisted. The documentation from the visit made no mention of the claimant's alleged disabling neck pain. (R. 238).

On June 4, 2010, the claimant visited the Fayette Medical Center emergency room reporting a pain in the side of her face. A CT scan of her facial bones performed the same day proved unremarkable. The nurse practitioner attending to the claimant prescribed pain medication and recommended that the claimant see an oral surgeon for further evaluation. (R. 225-30).

A June 18, 2010 progress note from Dr. Robert Long with Whatley Health Services

indicated some amount of obstructive parotitis causing her facial pain, some amount of facial swelling, and some tenderness and swelling in the parotid gland. Dr. Long also recommended that she return to the clinic for a follow-up examination in one week's time. (R. 237).

On June 21, 2010, by Dr. Long's referral, the claimant returned to the Fayette Medical Center for a CT scan. The scan was largely unremarkable, indicating only a borderline enlarged lymph node near the left parotid gland. The scan also indicated changes in fusion in the cervical spine; no acute abnormality in the cervical spinal region; overall good position of the locking plate and screws; and no evidence of sinusitis or mastoiditis. (R. 232).

Dr. Robert Long saw the claimant again through Whatley Health Services on July 6, 2010. The exam notes indicate a general improvement of her facial pain and obstructive parotitis, with an only mildly swollen left face. Dr. Long also noted some cervical lymphadenitis.[3] (R. 236).

*The ALJ Hearing*

Following the ALJ's denial of benefits, the claimant properly requested a hearing on October 16, 2008, and received a hearing before an ALJ on July 30, 2010. (R. 115-16, 59-98).

At the hearing, the claimant testified that her problems with her neck began when she fell on March 23, 2007. She testified that she ceased working soon, but not immediately, after her alleged injury. She testified that her symptoms have been gradually becoming worse since the injury and that she was unable to afford good medical care. (R. 70).

The claimant testified that she was still suffering debilitating, constant pain in her neck, left arm, and left leg. She testified that she experienced difficulty reaching, especially above her

---

[3] Lymphadenitis is the inflammation or swelling of a lymph node.

head, and that she could not do so without her symptoms becoming "really bad" or her arm going numb. However she stated that she was capable of doing some "normal things." She stated that the most uncomfortable position for her was to hold her head up or down, and that any job that would require her to sit at a table and lean forward would exacerbate her pain. (R. 73).

The claimant further testified that she would at most be able to walk on flat ground for approximately twenty minutes before experiencing pain in her leg and arm and requiring a period of rest. Similarly, she testified that she would be unable to simply stand in one place for more than approximately twenty minutes before requiring a period of rest. She further stated that she needed to lie down and rest "once or twice" during the course of a normal day, for approximately an hour, because of both her pain and the drowsiness caused by her medications Lortab, Naproxen, and Tylenol. (R. 75).

The claimant stated that her condition had generally deteriorated since her surgery. Yet, she testified that aside from her neck problem, she felt she was in good health. She stated that she experienced difficulty driving. The claimant testified regarding her normal daily activities, stating that she typically assisted with cleaning the house, cooked meals, watched television, and participated in regular outings such as attending church multiple times weekly. (R. 76-79).

The ALJ inquired as to the claimant's reason for not seeking further medical attention for her alleged neck pain between her discharge from surgery in 2007 and her emergency room visit in 2010. The claimant responded that her failure was due in part to the expiration of her insurance, and that she returned to the emergency room for medical care after unsuccessfully trying to manage pain with over-the-counter medications and finally "giv[ing] up and go[ing] to the doctor." (R. 80).

The ALJ inquired as to the nature and cause of the claimant's alleged side effects from her medication, to which the claimant testified that Naproxen caused her to feel nauseated, while Lortab caused her to feel tired and dizzy. She stated that she reported these side effects to her treating physician, who prescribed her Miloxicam as an alternative. The claimant indicated that Miloxicam did not cause her to experience the side effects but was not as effective in managing her alleged pain. (R. 80-83).

The ALJ then sought the testimony of the sworn vocational expert, Claude Peacock. The ALJ asked the VE to assume a younger person with limited education and the claimant's past work experience, capable of working at the light exertional level, lifting only five pounds frequently. The ALJ then asked the VE if such a person could work in any of the claimant's past relevant work, to which the VE responded that such a person could not do so. The ALJ then inquired if any work existed in the local and national economies suitable for a person with such limitations and experience. The VE responded that various machine tending positions, such as press tender or circuit board inspector, would be suitable and were present in significant numbers in the regional economy. The VE also testified that generally the full range of jobs that might be classified as "sedentary" would be available taking into account the claimant's condition. The VE indicated that if claimant's condition were to involve chronic moderately severe or severe pain, no jobs would be available. (R. 89-93).

Upon questions by the claimant's attorney, the VE again confirmed that either moderately severe or severe levels of pain and a need to lie down to rest several times per day would preclude the claimant from performing any jobs at the light or sedentary levels. The ALJ addressed the claimant's counsel's objection regarding the level of weight given the RFC and

disability assessment, given the non-medical nature of the examiner completing the assessment. The ALJ noted the objection and assured the claimant's attorney that such testimony is typically given reduced or little weight. (R. 94-95, 63).

*The ALJ's Decision*

On August 24, 2010, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. In reaching this conclusion, the ALJ first found that the claimant met the insured status requirements of the Social Security Act and had not engaged in substantial gainful activity since the alleged onset of her disability. (R. 8, 13).

Next, the ALJ determined that the claimant's medically determinable severe impairment was degenerative disc disease of the cervical spine, post C5-6 anterior discectomy and fusion. The ALJ held that the claimant did not have an impairment or combination of impairments meeting or equating to one of the listed impairments in 20 C.F.R. Pt. 404 Subpt. P, App. 1. The ALJ found generally that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, he found that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms incredible to the extent that they differed from the RFC. (R. 17).

In arriving at this conclusion, the ALJ referenced both items contained in and omitted from the claimant's medical history on record, as well as the credibility and nature of the claimant's own testimony and description of her abilities and daily activities. The ALJ specifically referenced the fact that after the claimant suffered neck pain resulting from her fall in March of 2007 and visited Dr. Balasky complaining about it, she did not seek further treatment until October of 2008, when she visited Dr. Luckey with a complaint of back pain and did not

make reference to her allegedly disabling neck pain at all. (R. 17, 18).

The ALJ then addressed the claimant's explanation for her failure to continue seeking treatment for her neck pain, namely, that the claimant was unwilling to seek such care because she had no insurance. The ALJ noted that the claimant did seek treatment from Dr. Luckey regarding her back and potential kidney stone issue as referenced above, and had a chance at that time to describe her symptoms and seek medical advice regarding her allegedly disabling neck pain, but did not do so. The ALJ also noted that when the claimant did seek treatment from Dr. Luckey, he provided no limitations to her ability to work. (R. 18)

The ALJ further referenced the fact that the claimant's visits to Dr. Robinson did not include any reference to disabling pain or physical limitations. The ALJ also pointed out that when Dr. Coleman examined the claimant in 2008, over a year after her last visit to Dr. Robinson, Dr. Coleman did not report that the claimant had disabling pain. The ALJ also referenced the claimant's own statements to Dr. Coleman in March of 2008 regarding her level of pain, as well as similar testimony the claimant made at the ALJ hearing, which together described the claimant's pain level as no greater than moderate. (R. 18).

The ALJ then addressed the clinical assessment completed by Dr. Long in June 2009, indicating that the claimant's condition would not allow her to work at all, explaining that he gave this opinion little if any weight, because the form was evidently completed by Dr. Long before he had a chance to examine the claimant himself. The ALJ did acknowledge that the later visit to Dr. Long by the claimant in June of 2010 did result in a prescription for pain medications in response to the claimant's diagnosis of possible obstructive parotitis. The ALJ noted this pain had vastly improved even a month later as indicated in her July visit to Dr. Long. (R. 19).

The ALJ then specifically underscored the fact that the assessment completed by Dr. Long in June 2009 is the only testimony from an attending physician on record addressing the disabling effects of the claimant's pain, but again deemed this testimony inconclusive for several reasons.  The ALJ cited as a reason for this conclusion that Dr. Long had evidently not yet examined the claimant in person when completing the form, which rendered invalid his opinion of the claimant's level of pain as well as how physical activity might affect the claimant.  The ALJ then pointed out that Dr. Long had described the impact of side effects from medication on claimant as "unknown," but no evidence existed regarding whether the claimant was taking medication at that time.  (R. 19).

The ALJ went on to explain that he considered the claimant's own testimony regarding her abilities and daily activities as inconsistent with disabling pain, specifically her testimony that she was able to cook, clean, and generally move about and make outings.  The ALJ then determined that the claimant's level of physical capability contained within the RFC was reasonable given the credible medical evidence regarding her range of motion and physical capabilities, such as Dr. Coleman's assessment of her range of motion and strength.  The ALJ found Dr. Coleman's assertion that the claimant's pain was "uncontrolled" unsupported by the record.  The ALJ concluded that the assessment of the claimant's abilities contained in the RFC was reasonable given the weight of the evidence.  The ALJ specified, however, that any personal opinion of the state examiner was afforded no weight, given that the disability examiner was not a medical professional.  (R. 20-21).

The ALJ determined that based upon the vocational expert's testimony concerning the claimant's established limitations, the claimant was not capable of performing any of her past

relevant work given her condition. However, the ALJ found that based on the vocational expert's testimony, jobs exited in significant numbers within the national economy that the claimant could perform. As a result, the ALJ found the claimant "not disabled." (R. 22-23).

## VI. DISCUSSION

The claimant argues that the ALJ improperly applied the Eleventh Circuit's three-part pain standard in discounting the claimant's subjective testimony of disabling pain. To the contrary, this court finds that the ALJ properly applied the pain standard and that substantial evidence supports his decision.

The three-part pain standard applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1219, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id.* (emphasis added). A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).

In applying the three-part standard, if the ALJ decides to discredit a claimant's subjective testimony of pain, he must explicitly articulate his reasons for discrediting it. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). Failure to articulate the reasons for discrediting the claimant's subjective complaints of pain requires that the testimony be accepted as true. *Id.* The ALJ also may properly consider the claimant's testimony regarding her daily activities when

assessing her credibility as a whole.  Indeed, such "credibility determinations are the province of the ALJ."  *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

In this case, the ALJ conceded that the claimant suffers from an underlying medical condition capable of producing the symptoms alleged; however, he found that the entirety of the medical evidence failed to support the claimant's testimony regarding severity the severity and disabling effect of her pain.

The ALJ explicitly articulated his reasons for discrediting the claimant's alleged severity of pain based on the entirety of the evidence contained within the record.  In her testimony at the ALJ hearing, the claimant stated that her pain was constant and severe enough to prevent her from working.  She also testified she could not walk for more than twenty minutes without pain or sit for more than thirty minutes, and had to lie down several times daily.  In discrediting this testimony, the ALJ referenced the claimant's subsequent testimony that she was able to aid around the house by cooking and cleaning for a total of a few hours daily, as well as drive herself to church regularly.  The ALJ also referenced the claimant's statements to Dr. Coleman asserting that she was capable of doing light housework and driving, activities the ALJ deemed incompatible with the disabling pain alleged by the claimant.  To support discrediting the claimant's subjective testimony, the ALJ also contrasted the claimant's own testimony at the hearing describing her pain level no higher than a "4 or 6" on a scale of ten with her earlier statement to Dr. Coleman that her pain was as high as seven on the same scale.  The ALJ also specifically referenced Dr. Coleman's description of the claimant's pain as "uncontrollable," discounting it by pointing out that such a description was unquantifiable.

The ALJ discounted Dr. Long's pain assessment of the claimant that indicated that the

claimant's pain effectively prevented any work.  The ALJ specified that no evidence existed in the record that Dr. Long personally examined the claimant before making this determination and further pointed out that the medical evidence from Dr. Long after he did examine the claimant in June of 2010 contained nothing contradicting the RFC.

The ALJ also properly considered the claimant's failure to mention her allegedly disabling pain when she sought medical treatment for other issues between 2008 and 2010.  The ALJ properly pointed out that when she sought medical treatment for back pain in 2008 and again for renal system issues in 2010, no justification existed for the claimant's failure to mention her allegedly disabling neck pain to the physicians or to seek treatment for that specific condition if she in fact was suffering from it as she claimed.

The ALJ can also properly consider the claimant's failure to seek treatment or medical attention regarding an allegedly disabling condition, if the claimant had no legitimate excuse for failing to do so.  *Sheldon v. Astrue*, 268 Fed. Appx. 871, 872 (11th Cir. 2008); *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).  Failure to seek treatment for legitimate reasons such as financial inability does not necessarily preclude a claimant from being found disabled.  In this case, however, no evidence exists that claimant's failure to seek advice or even mention her pain to the physicians she saw for other issues was supported by such a reason.  Furthermore, when the claimant did visit Dr. Luckey in 2010 regarding her renal system issues, Dr. Lucky reported that the claimant had no neurological or motor deficit.  (R. 238).

The claimant's primary objection to the ALJ's findings involved the vocational expert's testimony that someone like the claimant, who testified during the hearing that she was only able to walk for twenty minutes and needed to lie down several times daily, would not be able to

perform any work. The ALJ did not err by failing to consider this portion of the vocational expert's testimony; however, because he properly found the claimant's testimony regarding these limitations to be only partially credible based on the reasons described above.

This court finds that the ALJ properly discredited the claimant's testimony regarding her level of disabling pain through proper application of the established pain standard. The court further finds that the ALJ's decision is supported by substantial evidence within the record as a whole.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be AFFIRMED.

A separate order will be entered in accordance with this Memorandum Opinion.

DONE and ORDERED this 28th day of June, 2013.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE